UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLOS IVAN LLERA-PLAZA | : | |
| | : | |
| v. | : | No. 2:98-cr-00362-10 |
| | : | |
| UNITED STATES OF AMERICA | : | |

**O P I N I O N**
Motion for Compassionate Release, ECF Nos. 1238, 1256 - Denied

**Joseph F. Leeson, Jr.**                                                                          **June 8, 2021**
**United States District Judge**

## I. INTRODUCTION

Carlos Ivan Llera-Plaza, who is serving life imprisonment for multiple convictions of murder and for conspiracy to distribute cocaine, as well as consecutive terms of imprisonment on firearms charges, filed a pro se motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) due to his multiple medical conditions, including chronic kidney disease, and the coronavirus pandemic. For the reasons set forth below, even assuming the medical conditions are sufficiently serious, compassionate release is denied because the factors set forth in 18 U.S.C. § 3553(a) do not support a reduction in sentence and Llera-Plaza presents a danger to the community if released.

## II. BACKGROUND

Llera-Plaza, who is currently fifty-one years of age, was charged with numerous offenses, including conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. § 846, multiple counts of murder for hire in violation of 18 U.S.C. § 1958 and murder in aid of racketeering in violation of 18 U.S.C. § 1959, as well as conspiracy to commit the same, and

multiple counts of carrying a firearm during and in relation to crimes of violence in violation of 18 U.S.C. § 924(c). This case arose after a series of four murders-for-hire committed in Puerto Rico and Philadelphia, Pennsylvania in the summer of 1998. The four young men killed were Ricky Guevara-Velez, Luis Garcia, Jorge Martinez, and Jose Hernandez. Llera-Plaza and his coconspirators, including Wilfredo Martinez Acosta and Victor Rodriguez,[1] committed the murders to further the goals of a large cocaine and crack cocaine distribution organization.[2] The Government filed notice of its intent to seek the death penalty.

On May 13, 2002, several weeks after a jury trial commenced, Llera-Plaza pled guilty to all charges pursuant to a written plea agreement, in which the Government agreed to not seek the death penalty. The facts underlying the convictions are as follows: from at least 1996 through December 1998, the RCDO engaged daily in street sales of cocaine and crack in Philadelphia. The RCDO was selling more than a kilo and a half of crack and over three kilos of cocaine each week. In 1998, co-defendant Victor Rodriguez came to believe that two ex-employees of the RCDO, Hernandez and Martinez, had stolen cocaine belonging to the RCDO. Rodriguez spoke with one of his cocaine suppliers ("Aponte") from Puerto Rico about wanting to have Hernandez and Martinez killed. Llera-Plaza was a drug associate of Aponte. They, along with two other co-defendants, met and discussed the murders, for which Rodriguez offered to pay $25,000.

On June 17, 1998, they met again to carry out the planned murders. In Puerto Rico, after surveillance by Aponte and Llera-Plaza, the two co-defendants drove up to a vehicle they believed to be occupied by Hernandez and fired numerous shots. However, the driver was not Hernandez, but his friend Guevara-Velez. Llera-Plaza and his coconspirators later learned of the

---

[1] More than a dozen defendants were charged with drug trafficking offenses in connection with this case.
[2] The Rodriguez/Cacerez Drug Organization ("RCDO")

2
060721

mistake and again made plans to murder Hernandez, as well as Martinez. They traveled to Philadelphia to find the men, but were stopped by police on July 8, 1998, and found to be in possession of firearms. Llera-Plaza and a co-defendant fled from police. Thereafter, they located Martinez. On July 12, 1998, Llera-Plaza drove himself and Acosta up to a parked car occupied by Martinez. Acosta leaned out the car window and fired at least eighteen shots, killing Martinez and his seventeen-year-old nephew Garcia, who was in Martinez's car. Llera-Plaza returned to Puerto Rico and was paid part of the money for the murder, with the remaining amount being held until Hernandez was also killed. Llera-Plaza traveled back to Philadelphia a few months later and, on September 24, 1998, executed his plan to kill Hernandez. Llera-Plaza drove up to the residence where Hernandez stood in the doorway and his co-conspirator fired numerous shots at Hernandez. Llera-Plaza returned to Puerto Rico and Rodriguez paid him the remaining amount promised for the murders.

After his guilty plea, Llera-Plaza proceeded immediately to sentencing and was sentenced to the agreed-upon sentence of concurrent mandatory terms of life imprisonment for the murder charges, a concurrent sentence of life imprisonment on the conspiracy to distribute cocaine charge, and consecutive sentences totaling sixty-five years for the firearms counts, for a total sentence of life imprisonment plus 65 years. He did not file a direct appeal, but filed a motion under 28 U.S.C. § 2255 to vacate his sentence in 2013, which was denied as untimely. His subsequent requests for a certificate of appealability and for relief under Federal Rule of Civil Procedure 60(b) were also denied.

Currently pending is Llera-Plaza's pro se motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). *See* Mot., ECF No. 1238; ECF No. 1256 (supplemental motion). He argues that there are extraordinary and compelling reasons to reduce his sentence because of his

multiple medical conditions, which include chronic kidney disease, chronic lower back pain, and an irregular heartbeat.  Llera-Plaza argues that these conditions, which have limited his ability to perform physical activities, place him at a high risk for serious complications and/or death if he contracts COVID-19.[3]  He further submits that his sentence should be reduced to time-served because the First Step Act of 2018 eliminated the stacking provision in 18 U.S.C. § 924(c).[4]

The Government opposes the motion.  *See* Resp., ECF No. 1246.  The Government concedes that Llera-Plaza's chronic kidney disease presents a risk factor identified by the CDC[5] that would increase the risk of an adverse outcome from COVID-19.  It argues, however, that Llera-Plaza's medical conditions are being well-controlled with medication and he is able to perform activities of daily living.[6]  The BOP medical records have been filed as an exhibit.  Records, ECF No. 1247.  Additionally, the Government asserts that Llera-Plaza is not entitled to relief because he presents a danger to the community and a reduction would be contrary to the factors in 18 U.S.C. § 3553(a).

---

[3]  COVID-19 is caused by a coronavirus.  Both terms are used herein.
[4]  For the reasons set forth below, compassionate release is denied.  Because Llera-Plaza is serving life imprisonment, upon which the stacking provision in 18 U.S.C. § 924(c) has no impact, compassionate release is denied based on the stacking provision.
[5]  Center for Disease Control ("CDC")
[6]  The Government further states that since the coronavirus pandemic began, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of inmates and limit the spread of the virus.  The BOP's "action plan" was prepared over many years and has been repeatedly refined to address the coronavirus pandemic.  *See* BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited April 13, 2021).  The modified operations plan, *inter alia*, limits movement within and access to all BOP facilities; requires quarantine of newly admitted inmates, daily screening of facility staff, and screening of authorized private contractors and visitors; limits access to contractors performing essential services; suspends social visitation, while increasing inmates' telephone allowance; and encourages social distancing, the wearing of face masks, and other steps to limit the spread of the virus.  As it relates to FCI Williamsburg, the Government states that the institution houses 1,266 inmates, five of whom have tested positive and are isolated while they are treated/recover, with another four current inmates that previously tested positive and have recovered.

## III. LEGAL STANDARD

The First Step Act empowers criminal defendants to request compassionate release with the court after first complying with the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A).[7] This section dictates that the defendant must first move for compassionate release with the BOP, which then has thirty days to consider the request. *See United States v. Raia*, 954 F.3d 594, 595-97 (3d Cir. 2020) (holding that the risks COVID-19 poses in the federal prison system do not excuse the exhaustion requirement).

Once a defendant satisfies the exhaustion requirement, the court may reduce a term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if it finds that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). *See also* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Section 1B1.13 of the United States Sentencing Guidelines provides that the court may reduce a term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A), "if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that . . . extraordinary and compelling reasons warrant the reduction; . . . the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and [] the reduction is consistent with this policy statement." 18 U.S.C. Appx. § 1B1.13. *See also*

---

[7] Section 3582(c) is actually part of the Sentencing Reform Act of 1984 ("SRA"), but was amended by the First Step Act to provide prisoners a more direct route to court for their claims. *See United States v. Torres*, No. 18-414, 2020 WL 3498156, at *6 (E.D. Pa. June 29, 2020).

*United States v. Williams*, No. 15-471-3, 2020 U.S. Dist. LEXIS 147664, at *10 (E.D. Pa. Aug. 17, 2020) ("In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is 'not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)'" (quoting 18 U.S.C. Appx. § 1B1.13(2))).

The Sentencing Commission has identified the medical condition of a defendant as an extraordinary and compelling reason if:

> (i) The defendant is suffering from a terminal illness . . . .
> (ii) The defendant is—
>     (I)   suffering from a serious physical or medical condition,
>     (II)  suffering from a serious functional or cognitive impairment, or
>     (III) experiencing deteriorating physical or mental health because of the aging process,
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

18 U.S.C. Appx. § 1B1.13, App. Note 1. However, "the COVID-19 pandemic does not warrant the release of every federal prisoner with health conditions that make them more susceptible to the disease." *United States v. Santiago*, No. 15-280, 2020 U.S. Dist. LEXIS 124869, at *7 (E.D. Pa. July 15, 2020). Similarly, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."[8] *Raia*, 954 F.3d at 597. Even if a defendant's medical condition is sufficiently severe, the court must still consider the 18 U.S.C. § 3553(a) sentencing factors and

---

[8] *See* BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited April 12, 2021); *United States v. McLaughlin*, No. 17-121-2, 2021 U.S. Dist. LEXIS 29146, at *4-9 (E.D. Pa. Feb. 16, 2021) (summarizing the BOP's response to the coronavirus pandemic); Resp. 9-13.

whether the defendant is a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g). *See also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (holding that "the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit"). The § 3553(a) sentencing factors include, but are not limited to:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> . . .
> [4] the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.
> . . .

18 U.S.C. § 3553(a). Section 3142(g) provides:

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>   (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>   (2) the weight of the evidence against the person;
>   (3) the history and characteristics of the person, including—
>     (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>     (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).

## IV. ANALYSIS

Initially, the Court finds that Llera-Plaza has satisfied the exhaustion requirement by first seeking compassionate release with the BOP. *See* Mot. 2; Resp. 11. Additionally, the Government concedes that Llera-Plaza's chronic kidney disease is sufficiently serious so as to substantially diminish his ability to provide self-care in prison if he were to contract COVID-19 and therefore meets the threshold test in Application Note 1(A) of § 1B1.13. Nevertheless, the Government asserts that compassionate release is not warranted because Llera-Plaza would be a danger if released and, also, the factors set forth in 18 U.S.C. § 3553(a) do not support a reduction. This Court focuses its discussion on these issues.

### A. A reduction in sentence is not warranted because Llera-Plaza presents a danger to the community if released.

As previously described, Llera-Plaza pled guilty to his involvement in a drug distribution conspiracy, to multiple counts of murder for hire and murder in aid of racketeering, and multiple counts of carrying a firearm during and in relation to crimes of violence. His involvement with the RCDO, which sold more than a kilo and a half of crack and over three kilos of cocaine each week, is alone evidence that he presents a danger to the community. *See United States v. Munford*, No. 15-376-7, 2021 U.S. Dist. LEXIS 5423, at *12-13 (E.D. Pa. Jan. 12, 2021) (determining that "it is clear on an objective basis that [the defendant] still continues to present a danger to the community" where he had played a key role in a drug trafficking organization by conspiring to distribute a substantial amount of cocaine and marijuana and to launder money). This, however, was not his only crime.

Llera-Plaza accepted money to kill two individuals that had stolen from the RCDO and engaged in extensive planning to commit these murders. Even though he first mistakenly killed someone that had no involvement in the drug organization, Llera-Plaza did not reconsider his actions. Rather, he took numerous steps, including travel between Puerto Rico and Philadelphia, to locate and kill the two persons he was hired to murder. He successfully executed Martinez next, but also killed a seventeen-year-old boy in the process. This additional loss of life again did not dissuade Llera-Plaza from his plan to kill Hernandez. Several months after first agreeing to take money to commit two murders, Llera-Plaza was responsible for four deaths.

Based on the facts, Llera-Plaza clearly presents a significant danger to the community if he is released. *See United States v. Cooper*, 2021 U.S. Dist. LEXIS 79894, *17 (E.D. Pa. April 26, 2021) (denying compassionate release where the defendant participated in the planning and fulfillment of the heinous, pre-mediated murders of four people); *United States v. Martines*, 2021 U.S. Dist. LEXIS 23231, *16 (E.D. Pa. Feb. 8, 2021) (denying compassionate release to a defendant that had served approximately twenty-five years for his role in the murders and attempted murders of a rival criminal enterprise because he presented a danger to the community). Accordingly, a reduction in sentence is not consistent with applicable policy statements issued by the Sentencing Commission. *See Williams*, 2020 U.S. Dist. LEXIS 147664, at *10 ("In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is 'not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'" (quoting 18 U.S.C. Appx. § 1B1.13(2))).

**B.    The factors set forth in 18 U.S.C. § 3553(a) do not support a reduction in Llera-Plaza's sentence.**

For the reasons discussed in the previous section, the nature of the offenses and the characteristics of Llera-Plaza, weigh strongly against any reduction in sentence. His criminal

activity was very serious, spanned from Puerto Rico to Pennsylvania, lasted approximately two years and, as to the murders, took months of planning and execution. Llera-Plaza acted with a complete disregard for life and reducing his sentence of five terms of life imprisonment, plus a consecutive sixty-five years, would again disregard the lives of Ricky Guevara-Velez, Luis Garcia, Jorge Martinez, and Jose Hernandez. A sentence reduction would fail to provide just punishment for all the offenses, to protect the public from future crimes of Llera-Plaza, to promote respect for the law, or to afford adequate deterrence.[9] *See Martines*, 2021 U.S. Dist. LEXIS 23231 at *17 (considering the defendant's leadership role in the criminal enterprise and "the many lives he endangered or ended" and concluding that "a reduced sentence would not reflect the extremely serious and violent nature of [the] offenses nor does it further the aims of punishment and deterrence"); *United States v. Araña*, 2020 U.S. Dist. LEXIS 80394, *17 (E.D. Mich. May 7, 2020) (denying compassionate release to an inmate that was sixty-eight years of age and had served twenty-four years of a life sentence because in "addition to large scale drug-trafficking, this case involves the ultimate violence—the taking of a human life"). Given that four of the life imprisonment terms are statutory minimums, any reduction would also create an unwarranted sentencing disparity.

To the extent that § 3553(a) directs the court to consider the need to provide medical care, this factor does not weigh in favor of release because the prison is managing Llera-Plaza's

---

[9] This Court commends Llera-Plaza for participation in the LEAD program and for completing more than 5,000 hours of programs during his incarceration, as well as not having any misconducts since 2013. This Court also accepts for purposes of this Opinion that he has accepted responsibility and shown remorse for his actions. However, these considerations do not outweigh the extremely serious nature of his offenses or otherwise establish that the goals of § 3553(a) have been met.

medical needs[10] and has taken significant steps to limit the spread of COVID-19. *See United States v. Spencer*, 2020 U.S. Dist. LEXIS 206676, *6-7 (E.D. Pa. Nov. 4, 2020) (concluding that the need to provide for medical care in the most effective manner does not weigh in favor of compassionate release because although the inmate's medical condition places him at an increased risk in the event of a COVID-19 infection, he did not show that the prison is unable to provide medical care or protect against the risk of infection). Although Llera-Plaza contracted COVID-19 while incarcerated, he has since recovered. *See* ECF Nos. 1256-1257. Moreover, he remained "asymptomatic" during his fourteen-day quarantine period and did not have any of the common CDC symptoms related to COVID-19. At his discharge evaluation, he denied any other complaints or concerns.

For all these reasons, the § 3553(a) factors militate against a reduction. *See United States v. Burton*, No. 20-2748, 2021 U.S. App. LEXIS 6018, at *2-3 (3d Cir. Mar. 2, 2021) (affirming the district court's denial of compassionate release where, after assuming the medical condition was sufficiently severe, the § 3553(a) sentencing factors did not support compassionate release following the defendant's conviction for conspiring to distribute cocaine).

## V. CONCLUSION

Even assuming Llera-Plaza's medical conditions are sufficiently serious, compassionate release is denied because he presents a danger to the community if released. Not only was he involved in a serious drug trafficking conspiracy and unlawfully possessed firearms, but he killed four persons, one a seventeen-year-old boy. Reducing his sentence of five concurrent terms of

---

[10] *See e.g.* Records 2 (showing that as of October 5, 2020, Llera-Plaza was provided medication to treat his chronic back pain and counseling about medications, exercise/activity, diet, and recommended follow-up); Records 7 (stating that on October 1, 2020, Llera-Plaza denied any episodes of his heart racing or palpitations); Records 8, 24, 36 (indicating that Llera-Plaza receives medication for his chronic kidney disease).

life imprisonment plus a consecutive sixty-five years to a sentence of time served (approximately twenty-two years) would not be consistent with applicable policy statements issued by the Sentencing Commission and the factors set forth in 18 U.S.C. § 3553(a). The motion for compassionate release is therefore denied.

      A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge